UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

In Re:

OLD CUTTERS, INC.,

        Debtor.

_____

CITY OF HAILEY, an Idaho municipal
corporation,

        Appellant,

    v.

OLD CUTTERS, INC., an Idaho
corporation,

        Appellee,

And

MOUNTAIN WEST BANK, an Idaho
Banking corporation,

        Appellee/Cross-Appellant.

Case No. 1:13-CV-00057-EJL

**MEMORANDUM DECISION AND
ORDER**

Appellant City of Hailey ("Hailey") appeals the Memorandum Decision, Order and Judgment (Dkt. 1-1) entered by the United States Bankruptcy Court for the District of Idaho in Adversary Proceeding No. 11-8105. Hailey suggests the Bankruptcy Court erred when it invalidated the annexation fees and community housing provisions imposed by Hailey in connection with the annexation of property owned by the chapter 11 debtor, Old Cutters, Inc. ("Old Cutters"). Cross-Appellant Mountain West Bank ("MWB"), Old Cutters' principal creditor, agrees with the Bankruptcy Court's ruling with respect to the annexation fees and community housing provisions, but appeals the Court's finding that the description of the real property in the relevant annexation agreement satisfied the requirements of the Idaho statute of frauds.

Having reviewed and considered all the briefing of the parties, the court concludes that oral argument is not necessary to resolve the appeals. *See Fed. R. Civ. Proc. 78; Willis v. Pacific Maritime Ass'n*, 244 F.3d 675, 684 n. 2 (9th Cir. 2001). For the reasons set forth below, the court affirms the order of the Bankruptcy Court.

## BACKGROUND

By now, the facts of this case are well known to the parties and the Bankruptcy Court. Here, the Court briefly summarizes the relevant facts, relying

on the Bankruptcy Court's Memorandum of Decision and the parties' briefing on appeal.

*Acquisition of the Property*

In 2003 and 2005, Old Cutters purchased and assembled a tract of real property in Blaine County, Idaho (the "Property") that was contiguous to Hailey's city boundaries. Old Cutters acquired the Property with the intent to subdivide and develop it as a residential planned unit development. The total purchase price of the Property was $6.2 million, and Old Cutters' acquisition was financed through cash contributions from its principal, John Campbell ("Campbell") and his company, together with a $4.4 million bank loan made to Old Cutters.

When Old Cutters purchased it, the Property was located in Blaine County. In connection with its development planning, Old Cutters investigated various options for providing water and sewer services to the project. One option was to develop the Property in Blaine County. This option would require Old Cutters to construct a pocket sewage treatment plant for new housing and would require subdivision approval by Blaine County. A second option was to seek annexation of the Property into Hailey so the development could access city water and sewer services. This option would require Hailey to process and approve Old Cutters' annexation application.

*The Annexation Agreement and Fee*

Old Cutters, acting through Campbell, approached representatives for both Hailey and Blaine County to explore the aforementioned options. Blaine County Commissioner Sarah Michael informed Campbell that the County had a backlog of subdivision applications and estimated approval from the County would take more than a year. By contrast, Hailey city councilmember Rick Davis ("Davis") informed Campbell that Hailey could process the annexation application more quickly than the time required to obtain the authorization to develop the Property in Blaine County. The proposed short time frame to have the Property annexed was essential to Old Cutters' plans because it needed to begin selling lots as quickly as possible to pay off the loan it had obtained to purchase the Property.

Davis also advised Campbell that a fiscal study had been prepared in 2001 by consultant Tischler & Associates ("Tischler Study") that had been used by Hailey in connection with the recent annexation of a development property known as Airport West. The Tischler Study had analyzed and computed potential costs to Hailey resulting from the proposed annexation, and, based on its conclusions, made recommendations to Hailey concerning the amount it should impose on a

developer for annexation fees to offset the resulting actual costs to be incurred by Hailey in incorporating the new development.

Old Cutters reviewed the Tischler Study and estimated that, if the Property were to be annexed, the annexation fee it should expect to pay Hailey would be approximately $350,000. Hailey suggests the Tischler Study was intended for use relative to only the proposed Airport West annexation. Old Cutters counters that the Tischler Study expressly stated that it could be used for all future annexations. However, regardless of whether or not Old Cutters *should* have relied upon the Tischler Study in estimating the amount of annexation fees it would sustain, the Bankruptcy Court determined, and the evidence suggests, that Old Cutters assumed Hailey would fix the amount Old Cutters would be required to pay for an annexation fee based on the information in the Tischler Study.[1]

Old Cutters submitted its annexation application to Hailey in August 2003. The first public hearing before the Hailey city council concerning Old Cutters' annexation application occurred in November 2003. No decision was made about the application at that time, and the hearing was continued repeatedly to dates in

---

[1] In connection with the Airport West annexation, Hailey required Airport West developers to pay the exact amount of the annexation fees recommended by the Tischler Study. Further, the Tischler Study model was also used in at least two annexations subsequent to the Airport West annexation. (*See* Adversary Proceeding 11-8105, Deposition of Heather Dawson ("Dawson Dep."), Dkt. 50-2, 16:2-21.)

January, February, and March, 2004.   During a meeting held on March 8, 2004, the

Hailey city council decided that, in considering Old Cutters' application, it would

not use the Tischler Study to determine the annexation fee to charge Old Cutters, and

would instead seek completion of a new fiscal study.   Hailey ultimately employed

Management Partners ("MP") to conduct the new study.[2]

Hailey has taken inconsistent positions regarding the purposes of the MP

study.   On one hand, Heather Dawson ("Dawson"), Hailey's Clerk and Treasurer,

testified that the MP Report was intended to determine Hailey's actual costs of

annexation.   (Adversary Proceeding 11-8105, Dawson Dep., Dkt. 50-2,

42:18-43:1.)   However, Dawson also testified that the MP Report was not about

what Old Cutters would cost Hailey, but rather set a baseline fee below which Hailey

could not go and be fiscally responsible.   (*Id*., 44:8-45:1.)   Notably, Dawson

admitted that MP was not engaged to ascertain an equitable allocation of costs.

(*Id*., 44:15-45:1.)

MP eventually submitted an initial draft of its study in October 2005.

Having collected and analyzed a number of factors, the draft study recommended

---

2  Old Cutters contends Hailey decided to engage MP for a new annexation fee study,
while Hailey argues Old Cutters offered to pay for the MP study, and that Old Cutters
suggested MP could do a new study faster and cheaper than Tischler.   Which party was
responsible for commissioning the MP study is immaterial to resolution of this appeal.

that Old Cutters be charged $788,000 as an annexation fee for the Property.[3]   The

draft study arrived at this figure by not only referring to the direct costs to Hailey

resulting from the annexation, but by also including in the calculation a share of

Hailey's projected budget deficiencies, future capital expenditures, and other costs

not directly associated with the annexation of the Property.[4]

Before submitting its final report, MP spoke with Dawson and Hailey Public

---

3 MP calculated its fee by adding together three separate components:

> (1)  A five-year cost of Old Cutters' proportional share of Hailey's perceived
> annual service level deficiencies (i.e., the annual cost it would require to bring
> Hailey's service level up to a higher level);
>
> (2) A proportional share of the value of Hailey's current capital assets; and
>
> (3) A proportional share of the cost of future capital assets that Hailey would like to
> build.

(Dkt. 12-7, p. 57.)

4  Hailey implies the Bankruptcy Court erred in finding the initial $788,000 estimate
exceeded the actual costs to Hailey in annexing the Property, and cites to deposition
testimony of Dawson and Hailey city councilmember Martha Burke ("Burke") in support.
However, the Bankruptcy Court considered conflicting testimony of both Dawson and
Burke, and particularly Dawson's agreement in her deposition that the initial
recommended fee was "far in excess of what the City's actual costs are as a result of
annexing Old Cutters" when finding the $788,000 fee exceeded Hailey's actual costs of
annexation.   (*See, e.g*., Adversary Proceeding No. 11-8105, Dawson Dep. Dkt. 50-2,
44:23-25; 45:1-6; 71: 8-12.)   Moreover, the draft study itself explicitly accounted for more
than just Hailey's actual costs, as it included calculation of Old Cutters' proportional share
of Hailey's "wish list" of capital improvements, many of which have never been made.
(*Id*., 45:11-17; 62:5-19; 64: 1-8.)   As further discussed, *infra*, the Court finds there was
substantial evidence in the record to support the Bankruptcy Court's conclusion that
Hailey's actual costs of annexation were less than $788,000.

Works Director Tom Hellen regarding various capital assets or capital projects omitted from the draft study. MP further revised and submitted a final report in November 2005 to incorporate such projects. The revised MP report recommended the annexation fee be increased, this time to $1,875,920. This amount was derived by expanding the scope of annexation costs further to include a variety of additional future municipal capital projects that Hailey hoped to be able to undertake, as well as to include other factors beyond the actual costs of annexing the Property.[5]

Still not satisfied with the annexation fee, Hailey again requested that the MP report be adjusted. In December 2005, the MP concluded that $2,056,427 was an appropriate annexation fee for the Property. MP arrived at this figure by adding another $6 million worth of Hailey's desired capital assets to the report. Old Cutters' management was perplexed by this process and frustrated with the delays involved in Hailey's consideration of its application and repeated increases in the recommended annexation fees. Upon receiving MP's various recommendations, Old Cutters objected to the methodology utilized by the company, and repeatedly complained to both MP and Hailey about the repeated increases in the recommended annexation fee. Although Old Cutters strongly disputed the validity of the methods

---

5  For instance, the recommended fee in the revised November 2005 MP Report was augmented first by increasing the expected population of Old Cutters, which was achieved by not including any expectation for infill population growth. Hailey has admitted the omission of infill population growth was a mistake. (*Id*.; 57:23-58:14.)

utilized and the conclusions reached by MP, Old Cutters, through its attorney, eventually sent a letter to Hailey on January 6, 2006 offering to pay a $2,000,000 annexation fee. Old Cutters' offer was rejected by Hailey.

Another public hearing on Old Cutters' application was held on January 9, 2006. At that meeting, presumably based on her own analysis, Dawson recommended that the city council reject the latest MP recommended annexation fee, and suggested that, instead, the annexation fee negotiations between Hailey and Old Cutters start at not less than $3,000,000.[6] Hailey city council members agreed that $3,000,000 should be the starting point for further negotiations with Old Cutters.

After more meetings and negotiations between representatives for Old Cutters and Hailey, the parties eventually settled on $3,787,500 as the amount of the annexation fee to be paid by Old Cutters to Hailey. On April 6, 2006, Hailey and Old Cutters executed an Annexation, Services and Development Agreement ("Annexation Agreement"). As to the annexation fees, the Annexation Agreement included the following provision:

---

6 Hailey implies this amount was based on more than Dawson's analysis, and cites to deposition testimony of city councilmember Burke in support. (Dkt. 8, pp. 17-18.) However, the cited testimony does not provide any factual support for the $3,000,000 baseline Hailey determined was appropriate, and instead states only Burke's belief that an annexation must provide a positive benefit to the community, as the risk of simply breaking even would provide too great a risk to approve an annexation. (*Id.*)

The Parties acknowledge and agree that the annexation fee described in this Paragraph 4 are [sic] fair and equitable and that the annexation fees have been agreed upon as consideration for the City providing essential governmental and utility services to the Property and to mitigate the impact on the City of annexation and development of the Property.

(Adversary Proceeding No. 11-8105, Annexation Agreement, Dkt. 1-1, at ¶ 4.f.)

The Annexation Agreement required Old Cutters to pay the annexation fee in installments beginning sixty days after the final plat for the subdivision was recorded. *Id.* Then, each year after recordation up to year four, or when a certain percentage of the lots were sold, the agreement called for a payment by Old Cutters of $875,125. *Id.* To secure Old Cutters' obligation to pay the annexation fees, the Annexation Agreement granted Hailey a lien on the "Market Rate Lots" proposed to be developed in the Property. *Id.*

The Annexation Agreement also included a severance clause in a paragraph labeled "PARTIAL INVALIDITY." It stated:

In the event that any provision of this Agreement is deemed to be invalid by reason of the operation of any law, or by reason of the interpretation placed thereon by any court or other governmental body, this Agreement shall be construed as not containing such provision and the invalidity of such provision shall not affect the validity of any other provision hereof, and any and all other provisions hereof which otherwise are lawful and valid shall remain in full force and effect.

*Id.*, at ¶ 23.

On April 10, 2006, Hailey adopted Hailey Ordinance Number 939, which

officially annexed the Property into the city. The Annexation Agreement was initially recorded in the county recorder's office on April 27, 2006.

To finance Old Cutters' development of the Property, Old Cutters sought and obtained $12,000,000 in credit from MWB in December 2006.[7] To secure this loan, Old Cutters granted a mortgage on the Property in favor of MWB, which was recorded on December 4, 2006. (Adversary Proceeding No. 11-8106, Mortgage, Dkt. 1-2.) The loan amount was eventually increased to $13,133,000 in 2008, and MWB's mortgage against the Property was modified accordingly. *Id.*

As development of the Property proceeded, Old Cutters paid Hailey a total of $1,317,000 in annexation fees through four payments: $287,000 after the final plat for the subdivision was recorded; $930,000 in March 2009; and later, two $50,000 payments upon the sale of two lots. Relying upon the Annexation Agreement, Hailey contends the balance of $2,470,500 is due on the annexation fee, and claims this balance is secured by a first-position lien against the Property in Hailey's favor.

*Community Housing Requirements*

In December 2005, before the Annexation Agreement was reached, Hailey adopted what it called an "Inclusionary Community Housing Ordinance" ("ICH

---

[7] After the filing of this case, MWB was acquired through merger by Glacier Bank, a Montana banking corporation. MWB continues as a division and assumed business name of Glacier Bank. The parties and this Court accordingly use the identification "MWB" for clarity and consistency.

Ordinance"). According to the ICH Ordinance, all new residential developments of five lots or more were required to dedicate at least twenty percent of the total lots to affordable housing. Old Cutters intended to develop up to a total of 149 residential units on the Property, and the parties documented how Old Cutters planned to meet the requirements of the ICH Ordinance in the Annexation Agreement. The Annexation Agreement committed Old Cutters to develop twenty-five community housing units, and also provided that:

> **COMMUNITY HOUSING ORDINANCE**. [Old Cutters] hereby waives any right it may have to assert that the City's Community Housing Ordinance is invalid in whole or in part as it applies to the Subdivision [contemplated by the Annexation Agreement].

(Adversary Proceeding No. 11-8105, Annexation Agreement, Dkt. 1-1, at ¶ 11).

Presumably motivated by the adverse decisions of two state district courts holding that similar community housing ordinances were invalid, Hailey repealed the ICH Ordinance in 2010. However, although Old Cutters requested it do so, Hailey refused to amend the Annexation Agreement to release Old Cutters from the community housing requirements in the Annexation Agreement, citing the aforementioned waiver provision. Hailey did, however, agree to remove a similar community housing requirement it had imposed for development of a different subdivision known as Sweetwater. (Adversary Proceeding 11-8105, Deposition of Don Keirn ("Keirn Dep."), Dkt. 50-3, 65:11-23.)

*Procedural History*

The recession impacted Old Cutters' ability to sell lots, and, as a result, its ability to pay real property taxes, the balance due on the Annexation Agreement, and the MWB loan.   Old Cutters' financial difficulties caused it to file a petition for relief under chapter 11 on August 1, 2011.   (Bankruptcy Case No. 11-41261, Dkt. 1.)   In the bankruptcy proceeding, Old Cutters cited to the delays and costs it incurred in the annexation process, and its corresponding inability to take advantage of a favorable real estate market proceeding the recession, as the primary reasons for the bankruptcy filing.   (*Id*., Dkt. 100, p. 7.)

Other than Blaine County's claims for unpaid real estate taxes, only three parties asserted creditor claims in Old Cutters' bankruptcy case.   Old Cutters Investment, LLC, filed an unsecured claim for $8,314,446.00, arising out of a "real estate sale."   (*Id*., Claim No. 1-1.)   MWB filed a claim for $9,227,327.29, secured by the Property.   (*Id*., Claim No. 2-1.)   And Hailey filed a claim for $2,579,855.64 based on the Annexation Agreement, secured by the "Market Rate Lots."   (*Id*., Claim No. 3-1.)   Shortly after Hailey filed its proof of claim, Old Cutters commenced an adversary proceeding against Hailey.   (Adversary Proceeding No. 11-8105, Dkt. 1.)   In its complaint, Old Cutters sought a declaratory judgment determining that "the annexation fee that continues to be demanded by [Hailey] is

unlawful, that [Old Cutters] does not owe any additional annexation fees to [Hailey], and that [Hailey] be permanently enjoined from enforcing the Annexation Agreement's community housing requirements against Old Cutters."   (*Id*.)

MWB commenced an adversary proceeding against Hailey a few days after Old Cutters filed its complaint.   (Adversary Proceeding No. 11-8106, Dkt. 1.)   In its complaint, MWB sought a determination that Hailey's claimed lien in the Property is invalid.   (*Id*.)   MWB also objected to the allowance of Hailey's proof of claim, echoing many of the arguments made in the Old Cutters complaint, including that the annexation fee exceeded Hailey's powers and was otherwise "illegal." (*Id*., pp. 4-5)

On October 10, 2012, Old Cutters filed a motion for summary judgment. (Adversary Proceeding No. 11-8105, Dkt. 50.)   In its motion, Old Cutters asked the Bankruptcy Court to declare that, in imposing the annexation fee and community housing requirements, Hailey exceeded its legislative powers, and that those provisions of the Annexation Agreement were unenforceable.   On the same day, MWB filed a motion for summary judgment.   (*Id*., Dkt. 52.) [8]   In its motion for

---

8   Old Cutters and MWB filed separate complaints against Hailey.   At a March 2012, joint pre-trial conference, the Bankruptcy Court granted a motion by MWB to consolidate Old Cutters, Inc. v. City of Hailey (Adversary Proceeding No. 11-8105) and Mountain West Bank v. City of Hailey (Adversary Proceeding No. 11-8106).   For clarity and convenience, the Bankruptcy Court directed the continued use of a dual caption and that all future pleadings be filed only in Adversary Proceeding No. 11-8105.

summary judgment, MWB sought a declaration from the Court that the Annexation Agreement did not create an enforceable lien on the Property under the Idaho statute of frauds and mortgage statutes. MWB also joined Old Cutters' arguments challenging both the annexation fee and the community housing requirements in the Annexation Agreement as unenforceable.

Hailey also filed a cross-motion for summary judgment on October 10, 2012. (*Id.*, Dkt. 57.) Hailey sought a judgment declaring that the Annexation Agreement created an enforceable lien in the Property, and that the Annexation Agreement fee and housing requirement provisions of the parties' contract were valid and enforceable.

The Bankruptcy Court conducted a hearing on the summary judgment motions on November 20, 2011. On December 31, 2012, the Bankruptcy Court issued its decision granting summary judgment as to Counts I and II of Old Cutters' complaint. Specifically, the Court concluded that the annexation fee and community housing provisions of the Annexation Agreement were unenforceable. Given such findings, the Court also granted MWB's motion to the extent it requested summary judgment disallowing Hailey's proof of claim in the bankruptcy case. However, the Court denied MWB's request that the Court declare Hailey's lien unenforceable under the Idaho statute of frauds and mortgage statutes, and granted

Hailey's motion for judgment with respect to this issue.[9]

Hailey filed a Notice of Appeal with this Court on February 4, 2013. (Dkt. 1.) In its appeal brief, Hailey challenges the Bankruptcy Court's conclusion that Hailey was without statutory authority to impose the annexation fees and community housing requirements in the Annexation Agreement, and challenges the Court's finding that the annexation fee already imposed by Hailey exceeded the actual costs Hailey incurred in annexing the Property. Hailey also contends the Bankruptcy Court erred in determining that Old Cutters' claims regarding the fees and housing requirements were justiciable. Finally, Hailey assigns error to the Bankruptcy Court's finding that Old Cutters was not barred by estoppel from asserting its claim that the annexation fee and community housing requirements were unenforceable.

MWB filed a cross-appeal on April 3, 2013. (Dkt. 11.) Although MWB's appeal brief primarily argues the Bankruptcy Court was correct to disallow Hailey's proof of claim because the annexation fee was unenforceable and because the annexation fee already paid by Old Cutters exceeded Hailey's actual costs of annexation, MWB also appeals the Bankruptcy Court's finding that the description

---

9 Although Hailey's motion for summary judgment as to MWB was granted in part with respect to creation of a lien, the Court held the lien was ultimately unenforceable because Hailey did not have a valid claim to collect any further amounts from Old Cutters under the Annexation Agreement given the illegality of the fee.

of the Property in the Annexation Agreement satisfied Idaho's statute of frauds. (Dkt. 13.)

The parties submitted briefing and the appeal and cross-appeal became ripe for review on January 16, 2014.

## STANDARD OF REVIEW[10]

When reviewing a bankruptcy court's decision, "'a district court functions as [an] appellate court and applies the standard of review generally applied in federal court appeals.'"   *In re Crystal Properties, Ltd.*, 268 F.3d 743, 755 (9th Cir.2001) (quoting *In re Webb,* 954 F.2d 1102, 1103-04 (5th Cir.1992)).   "A district court reviews a bankruptcy court's conclusions of law and interpretation of the Bankruptcy Code *de novo.*" *In re Orange County Nursery, Inc.*, 439 B.R. 144, 148 (C.D.Cal. 2010).   Factual findings are reviewed for clear error, and the court must accept the bankruptcy court's factual findings "unless, upon review, the court is left with the definite and firm conviction that a mistake has been committed by the bankruptcy judge."   *In re Greene,* 583 F.3d 614, 618 (9th Cir. 2009); *see* Fed.R. Bankr.P. 8013 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.").

---

10 The Court has jurisdiction over Hailey and MWB's appeals pursuant to 28 U.S.C. § 158(a).

Hailey's appeal is based on purported errors in both the Bankruptcy Court's conclusions of law and findings of fact. Both the *de novo* and clearly erroneous standards of review thus apply. Specifically, the *de novo* standard is applicable to Hailey's assertions of error regarding the Bankruptcy Court's interpretation of Idaho law with respect to the validity and reviewability of the annexation fee. However, the clearly erroneous standard applies to the Bankruptcy Court's determination that the annexation fee already paid by Old Cutters exceeded Hailey's costs of annexation. The *de novo* standard of review applies to MWB's appeal of the Bankruptcy Court's ruling with respect to the Idaho statute of frauds.

When reviewing a grant or denial of summary judgment in an adversary proceeding, the "the familiar summary judgment standard established in Federal Rule of Civil Procedure 56 applies." *In re Garcia*, 465 B.R. 181, 186 (Bankr.D. Idaho 2011); *see also* Fed.R.Bankr.P. 7056 (incorporating Civil Rule 56). Civil Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Instead, there must be a genuine

dispute about a material fact that could affect the case's outcome. *Id*., at 248.

When parties file cross-motions for summary judgment, the court will consider each motion on its own merits, but may consider the entirety of the evidence submitted by each party, regardless of which party submitted such evidence. *Fair Housing Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136-37 (9th Cir. 2001).

## ANALYSIS

In its appeal brief, Hailey assigns error to four aspects of the Bankruptcy Court's decision. First, Hailey contends the Bankruptcy Court erred in concluding that Hailey did not have the statutory authority to charge the annexation fees and impose the community housing provision it contracted for in the Annexation Agreement. Second, Hailey suggests the Bankruptcy Court improperly reviewed the annexation fee and community housing requirements, as the Annexation Agreement was an integral part of the Hailey city council's legislative decision to annex the Old Cutters' Property. As such, Hailey suggests Old Cutters' claims regarding the terms of the agreement were not justiciable. Third, Hailey argues the Bankruptcy Court erred by failing to apply the doctrines of quasi- and equitable estoppel to Old Cutters' claim that the annexation fee and community housing provisions were unenforceable. Finally, Hailey maintains the Bankruptcy Court

erred when it determined that the annexation fee already paid by Old Cutters exceeded the actual costs incurred by Hailey in annexing the Property.

MWB appeals only the Bankruptcy Court's determination that the description of the Property used in the Annexation Agreement satisfied the Idaho statute of frauds, but suggests the Bankruptcy Court's decision should be affirmed with respect to each of the purported errors raised by Hailey. Old Cutters solely responds to Hailey's challenges and does not address MWB's appeal. As the majority of the briefing by each of the parties is devoted to Hailey's argument, the Court will turn first to Hailey's appeal.

## 1. Reviewability of the Annexation Agreement[11]

Hailey contends the Bankruptcy Court erred when it determined Old Cutters' claims regarding the annexation fee and community housing provisions were justiciable and subject to judicial deliberation. Before this Court reaches the issue of whether the annexation fee and community housing provisions were *ultra vires*, it must thus first consider whether the Bankruptcy Court had the authority to review

---

11 Hailey raised other challenges regarding the justiciability of Old Cutters' complaint in its cross-motion for summary judgment, including that Old Cutters' challenge to the terms of the Annexation Agreement was barred by the applicable statute of limitations and by the Idaho Supreme Court's decision in *Steele v. City of Shelley* (*In re City of Shelley*), 255 P.3d 1175 (Idaho 2011). (Dkt. 1-1, pp. 32-37, 39.) The Court will not address such issues here as Hailey does not raise them on appeal. *Gardner v. Stager*, 103 F.3d 886, 887 n. 2 (9th Cir. 1996) (issues not raised on appeal are considered abandoned).

what Hailey characterizes as legislative decisions by the city council.

The complaints of Old Cutters and MWB were both in the form of declaratory judgment actions.[12] A prerequisite to a declaratory judgment action is an actual or justiciable controversy. *Harris v. Cassia Cnty.*, 681 P.2d 988, 991 (Idaho 1984). Justiciability is generally divided into subcategories: advisory opinions, feigned and collusive cases, standing, ripeness, mootness, political questions, and administrative questions. *Miles v. Idaho Power Co.*, 778 P.2d 757, 761 (Idaho 1989) (citing 13 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 3529 (2d ed. 1984)). Hailey contends the Bankruptcy Court erred in concluding Old Cutters' claims were justiciable because Hailey's decisions regarding whether to annex the Property were legislative acts, not subject to judicial review under the political question doctrine, and because Old Cutters' claims are moot under *Wylie v. State of Idaho, Idaho Transportation Board*, 253 P.3d 700 (Idaho 2011) ("Wylie v. State" or "Wylie").

*a.  Political Question*

Hailey argues the Annexation Agreement was an integral part of the Hailey city council's legislative decision to annex the Property and, in making this decision,

---

12   In its brief, MWB joins Old Cutters' arguments challenging the legality of the annexation fee and housing requirements in the Annexation Agreement, and opposing Hailey's arguments with respect to justiciability and estoppel. For simplicity, the Court will refer to both Old Cutters and MWB's claims with respect to the aforementioned issues as "Old Cutters' claims."

Hailey exercised total discretion not subject to judicial review. (Dkt. 8, p. 38.)

Therefore, Hailey contends the Bankruptcy Court erred in reviewing the Annexation

Agreement and in finding Old Cutters' claims presented a justiciable controversy.

(*Id.*) In support of this argument, Hailey highlights the multitude of factors it

considered when deciding whether to annex the Property. (*Id.*, pp. 39-41, 43; *see*

*also* Dkt. 15, pp. 16-17.) Hailey cites such factors in order to illustrate that the

decision of whether to annex a property requires a municipality to utilize significant

discretion, which, as a legislative decision, the municipality is alone empowered to

exercise.

 Under the political question doctrine, the question is whether a court, "by

entertaining review of a particular matter, would be substituting its judgment for that

of another coordinate branch of government, when the matter was one properly

entrusted to that other branch." *Miles*, 778 P.2d at 761 (citations omitted). As the

Bankruptcy Court explained, Old Cutters' complaint did not require the court to

substitute its judgment for that of Hailey with respect to Hailey's decision to annex

the Property. (Dkt. 1-1, p. 37) (stating, "Old Cutters is not asking this Court to

second-guess the decision of Hailey's city council in annexing the Property, as

embodied in the ordinance implementing the annexation of the Property.") Indeed,

both Old Cutters and MWB agree with Hailey's decision to annex the Property, and

do not challenge the validity of the annexation ordinance. (Dkt. 12, p. 47; Dkt. 13, p. 24.) While Hailey's decision to annex the Property involved "an initial policy determination of a kind clearly for nonjudicial discretion," the question before the Bankruptcy Court was not whether the annexation decision was wise policy. *Baker v. Carr*, 369 U.S. 186, 217 (1962). Rather, the question was whether Hailey had statutory authority to impose the fee and housing provisions it required as a condition to annexation.

In the adversary proceeding, Old Cutters alleged Hailey acted without statutory authority by requiring Old Cutters to agree to the aforementioned provisions as a condition to annexation. As the Bankruptcy Court correctly noted, "'[p]assing on the constitutionality of statutory enactments, even enactments with political overtones, is a fundamental responsibility of the judiciary, and has been so since *Marbury v. Madison*, 5 U.S. 137 (1813).'" (Dkt. 1-1, p. 36) (quoting *Miles*, 778 P.2d at 768). Rather than seeking review of Hailey's decision to annex the Property, Old Cutters instead sought a determination as to whether the conditions to annexation Hailey imposed in the Annexation Agreement were enforceable. The Bankruptcy Court had the authority to consider this issue under Idaho Code § 10-1202, which provides:

> Any person interested under a deed, will, written contract or other writings constituting a contract or any oral contract, or whose rights, status or other

legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder.

I.C. § 10-1202.

The Bankruptcy Court was therefore not precluded from reviewing the annexation fee and community housing obligations Hailey required as a condition to annexation.

Hailey argues Idaho Code § 50-222 does not provide any limitation on the terms and conditions a municipal corporation may negotiate and agree to in the annexation decision-making process, and notes courts are "bound to respect the reasonable exercise by the legislature of powers expressly delegated to it by the constitution of this state, and in the absence of other constitutional offense cannot interfere with it." (Dkt. 8, pp. 41-42) (quoting *In re SRBA Case No. 39576*, 912 P.2d 614, 623 (Idaho 1995)). However, municipalities do not enjoy unfettered power to act in the absence of an express statutory limitation. Instead, "[m]unicipal corporations in Idaho may exercise *only* those powers granted to them by the state Constitution or the legislature." *Alpert v. Boise Water Corp.*, 795 P.2d 298, 304 (Idaho 1990) (emphasis added) (citations omitted); *Alliance for Property Rights and Fiscal Responsibility v. City of Idaho Falls*, 742 F.3d 1100, 1102 (9th Cir. 2013) ("'Idaho has long recognized the proposition that a municipal corporation, as a

creature of the state, possesses and exercises only those powers either expressly or impliedly granted to it.'") (quoting *Caesar v. State*, 610 P.2d 517, 519 (Idaho 1980)).    As will be discussed further, *infra*, the Bankruptcy Court correctly determined Hailey was without statutory authority to impose the community housing provision and to collect sums in excess of the costs reasonably related to the annexation itself.   Because Hailey did not have the power to collect the annexation fee and impose the community housing provisions it required of Old Cutters, the Bankruptcy Court did not improperly interfere with a legislative decision when it invalidated such portions of the Annexation Agreement.

Hailey also challenges the Bankruptcy Court's finding that Old Cutters' claims were justiciable because they were directed at the Annexation Agreement and not the annexation ordinance.   Hailey maintains the ordinance and the agreement were "inextricably bound up in the political decision making process which is beyond the reach of judicial review."   (Dkt. 8, p. 43.)   Again, however, Old Cutters did not seek judicial review of Hailey's political decision to annex the Property, as embodied in the annexation ordinance.   A petition for judicial review represents an appeal of a decision made by a governing body.   *Chavez v. Canyon Cnty.*, 271 P.3d 695, 700 (Idaho 2012) (citing *Carter v. State, Department of Health & Welfare*, 652 P.2d 649, 650 (Idaho 1982)).   By contrast, a declaratory judgment action attacks the

authority of the governing body. *Chavez*, 271 P.3d at 700. In finding Hailey acted without statutory authority when it imposed community housing obligations and required Old Cutters to pay more than Hailey's actual costs of annexation, the Bankruptcy Court did not substitute its judgment for that of Hailey's city council, and instead appropriately interpreted and applied the law. *Miles*, 778 P.2d at 762 (while advisability of agreement between State of Idaho and Idaho Power Company was not a proper subject for judicial review, the court was not precluded from reviewing the constitutionality of the agreement).

   *b. Mootness*

   Hailey suggests the Bankruptcy Court erred in failing to find Old Cutters' claims were moot under *Wylie v. State*, 253 P.3d 700 (Idaho 2011) because such claims were based upon an unambiguous contract. As mentioned, the Bankruptcy Court determined it had the authority to declare the rights of the parties to an annexation agreement under Idaho Code § 10-1202. An important limitation upon courts' jurisdiction under I.C. § 10-1202 is that "a declaratory judgment can only be rendered in a case where an actual or justiciable controversy exists." *Wylie*, 253 P.3d at 705. A justiciable controversy is:

>   distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of the parties having adverse legal interests. It must be a real and substantial controversy

admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Idaho Schools for Equal Educ. Opportunity v. Idaho State Bd. of Educ.*, 912 P.2d 644, 649-50 (Idaho 1996) (quotation and citations omitted).

Given the justiciable controversy criteria, courts may not rule on declaratory judgment actions which present questions that are moot or abstract. *Id.*, at 650. A declaratory judgment action is moot "where the judgment, if granted, would have no effect either directly or collaterally on the plaintiff, the plaintiff would be unable to obtain further relief based on the judgment and no other relief is sought in the action." *Id.*

In *Wylie v. State*, 253 P.3d 700 (Idaho 2011), plaintiff filed a declaratory judgment action seeking a declaration that the Idaho Transportation Department ("ITD") had exclusive jurisdiction to control access from the plaintiff's property to the highway, and declaring a city ordinance controlling access void on state preemption grounds. In 2005, the City of Meridian had passed an ordinance regulating development along state highways within its boundaries. The ITD collaborated with Meridian in drafting the ordinance. The ordinance contained a provision stating, "[n]o new approaches directly accessing a state highway shall be allowed." *Id.*, at 702.

Subsequently, plaintiff's predecessor in interest purchased ten acres of real property located outside of the then existing Meridian city limits. In conjunction with the annexation, zoning, and approval of the Property, Meridian entered into a Development Agreement with plaintiff's predecessor in interest. The Development Agreement, among other things, included an unambiguous commitment by the property owner against any access onto or off of Chinden Boulevard (a state highway). Plaintiff subsequently purchased the property and applied for a variance from Meridian to obtain access from the state highway to the property. Meridian denied the variance request based on the ordinance, the Development Agreement, and a letter from ITD stating that, under its regulations, the proposed access was not approved. Plaintiff also applied to ITD for an encroachment permit to access to the state highway from the property; ITD denied the encroachment permit request and plaintiff appealed.

Plaintiff filed a declaratory judgment action requesting that the court declare ITD had exclusive jurisdiction to control access from plaintiff's property to the state highway and that the ordinance was void. On summary judgment, the district court found in favor of the city because notwithstanding the provisions of the ordinance, the Development Agreement contained an unambiguous commitment by plaintiff's predecessor in interest not to seek direct access to the state highway. *Id*., at 704.

In affirming the district court, the Idaho Supreme Court held "there is no justiciable controversy with regard to [plaintiff's] claims because the [Development Agreement] unambiguously provides that his property will not have direct access to [the state highway]." *Id.*, at 706. The Court further explained "since the [Development Agreement] unambiguously restricts the ability of [plaintiff's] property to have direct access to [the state highway], there is simply no justiciable issue based on the Agreement. Any claim [plaintiff] may have had under the Agreement is moot[.]" *Id.*

Hailey suggests Old Cutters "is in precisely the same position" as plaintiff in *Wylie*, and argues the Bankruptcy Court should have determined Old Cutters' claims were similarly moot because Old Cutters voluntarily entered into an unambiguous agreement regarding the annexation fees and community housing provisions with Hailey. (Dkt. 8, p. 45.) Although the holding in *Wylie* appears applicable to this case, the portions of the *Wylie* opinion Hailey omits are also on point. Specifically, in considering plaintiff's claim that the ordinance was *ultra vires* because it usurped the exclusive authority of ITD to control access to a state highway, the *Wylie* court significantly noted:

> [Plaintiff's] claims are not confined to those arising under the [Development Agreement]. The main thrust of his complaint is that the Ordinance is invalid, either because it is preempted by state law or an ultra vires act of the City. *These claims are not rendered nonjusticiable by virtue of the*

> *Agreement*.   Although there is a provision in the Agreement requiring compliance by the developer with all city ordinances, that does not necessarily preclude Wylie from challenging, and obtaining a court ruling upon, the validity of the Ordinance.   However, his claims regarding the Ordinance are equally without merit.   There is no question that ITD is vested with the authority to designate state highways as 'controlled-access facilities and regulate, restrict or prohibit access to those highways.'   Nevertheless, a municipality has the authority to create specific development standards regarding roadways, rights-of way, grades, alignments and intersections under the Local Land Use Planning Act.

*Id*., at 707 (emphasis added) (quoting I.C. § 40-310(9)).

In this case, unlike in *Wylie*, there was a question of whether Hailey was vested with the authority to impose the annexation fees and community housing provisions.   As such, resolution of this issue was not rendered nonjusticiable by virtue of the Annexation Agreement, and the Bankruptcy Court was correct to rule on the validity of Hailey's imposition of such terms.   As Old Cutters notes, it appears the *Wylie* Court did not consider the issue of whether a city can enforce an otherwise illegal requirement contained in a permit or license simply by requiring the applicant to sign a contract agreeing to the illegal condition.   (Dkt. 12, p. 50.) Instead, because *Wylie* involved a valid ordinance, it appears the effect of invalid ordinance was not further explored.   However, the Idaho Supreme Court did address the issue of whether a city may contractually attach *quid pro quo* conditions to its legislative decisions in *Black v. Young*, 834 P.2d 304, 308 (Idaho 1992), and determined such conditions are *ultra vires*.   The Bankruptcy Court's ruling in this

case is thus distinguishable from *Wylie* and, as will be further discussed, is consistent with the Idaho Supreme Court's ruling in *Black*.

Further, the court in *Wylie* found plaintiff's claims were moot because highway access would still be unavailable to plaintiff even if the court invalidated the ordinance, as ITD had also denied plaintiff's application for an encroachment permit. Thus, plaintiff's desired highway access would be precluded regardless of the *Wylie* court's ruling. *Wylie*, 253 P.3d at 708. Such circumstances illustrated plaintiff's claims were moot because "the judgment, if granted, would have no effect either directly or collaterally on the plaintiff." *Idaho School for Equal Education Opportunity*, 912 P.2d at 650. By contrast, the Bankruptcy Court's ruling with respect to the validity of the annexation fees directly affected the outcome of Old Cutters' claims, and the Court's ruling gave both Old Cutters and MWB the relief sought. By invalidating Old Cutters' obligation to pay additional annexation fees to Hailey, the Bankruptcy Court's ruling disallowed Hailey's secured claim and rendered MWB a first-position secured creditor. As such, the Court correctly found Old Cutters claims were not moot, and were justiciable.

### 2. Statutory Authority for the annexation fee

The crux of Hailey's appeal is its challenge to the Bankruptcy Court's finding that Hailey did not have statutory authority to contract for annexation fees that

exceeded the "actual costs" of annexation.   In its appeal brief, Hailey maintains it

had implied authority under Idaho Code § 50-222, and express authority under Idaho

Code § 50-301, to impose such fees.[13]

*a.  Idaho Code § 50-222*

Idaho Code § 50-222(2) provides:

> (2)    General authority.   Cities have the authority to annex land into a city
> upon compliance with the procedures required in this section.   In any
> annexation proceeding, all potions of highways lying wholly or partially
> within an area to be annexed shall be included within the area annexed unless
> expressly agreed between the annexing city and the governing board of the
> highway agency providing road maintenance at the time of annexation.
> Provided further, that said city council shall not have the power to declare
> such land, lots or blocks a part of said city if they will be connected to such
> city only by a shoestring or strip of land which comprises a railroad or
> highway right-of-way.

I.C. § 50-222(2).

As there was no issue of "shoestring" or "strip of land" annexation in this

case, Hailey maintains the annexation of the Property was clearly within the

authority granted to all Idaho municipalities by I.C. § 50-222(2).   However, the

---

13   Hailey also argued below that it had authority under its general police powers to
negotiate and contract for the annexation fee.   (Dkt. 1-1, pp. 52-53; *see also* Adversary
Proceeding 11-8105, Hailey's Motion for Summary Judgment, Dkt. 68, p. 19.)   However,
on appeal, Hailey maintains the "Annexation Agreement fees have nothing to do with the
police power," and that Hailey "does not and could not rely on its police powers as
authority for the Annexation Agreement."   (Dkt. 15, pp. 10-11.)   Hailey has accordingly
narrowed the issue to whether it was empowered by I.C. §§50-222 and 50-301 to negotiate
and contract for an annexation fee in excess of actual costs.   As the Bankruptcy Court
noted, the aforementioned issue appears to be one of first impression.   (Dkt. 1-1, p. 53.)

appellees do not dispute, and the Bankruptcy Court did not find, that Hailey was without statutory authority to annex the Property under I.C. § 50-222(2). As previously discussed, *supra*, the Bankruptcy Court did not review Hailey's decision to annex the Property, but instead considered whether Hailey had the authority to impose the annexation fee and community housing provisions it required as a condition to annexation.[14]

Hailey contends the plain language of I.C. § 50-222, when read as a whole, "necessarily grants to cities the implied power to enter contracts regarding annexation without reference to 'the actual costs of annexation incurred.'" (Dkt. 8, p. 29.) However, as the Bankruptcy Court noted, I. C. § 50-222 is silent as to whether a city may enter into a contractual annexation with a landowner. Assuming a city may do so, the statute is also mum about what terms and performance a city may require from the owner of annexed land within such agreement. (Dkt. 1-1, p. 54.)

Under Idaho law, municipalities have three sources of power and no others:

---

14    Hailey next describes the various classes or categories of annexation: A, B, and C. (Dkt. 8, p. 25.) The parties agree that annexation of the Property was a Category A (consensual) annexation. Hailey's reference to the annexation plan requirements for Category B and C annexations is irrelevant because Category A annexations do not require an annexation plan. *See*, I.C. § 50-222(3)(a)(i-iii).

> 1. Powers granted in express words; 2. Powers fairly implied in or incident to those powers expressly granted; and 3. Powers essential to the accomplishment of the declared objects and purposes of the corporation.

*Black v. Young*, 834 P.2d 304, 310 (Idaho 1992) (citing *O'Bryant v. City of Idaho Falls*, 303 P.2d 672, 674-75 (Idaho 1956)). If a municipality attempts to exercise a power that has not been expressly granted, granted by implication, or is essential to the accomplishment of a purpose of the corporation, the municipality's action is an *ultra vires* act. *Id.*

Idaho Code § 50-222 recites the "Legislative Intent" upon which the statute was founded, providing:

> The legislature hereby declares and determines that it is the policy of the state of Idaho that cities of the state should be able to annex lands which are reasonably necessary to assure the orderly development of Idaho's cities in order to allow efficient and economically viable provision of tax-supported and fee-supported municipal services, to enable the orderly development of private lands which benefit from the cost-effective availability of municipal services in urbanizing areas and to equitably allocate the costs of public services in management of development on the urban fringe.

I.C. § 50-222(1).

Given this legislative intent, the Bankruptcy Court determined Idaho cities have the essential power to contract for annexation and to charge an annexation fee if such fee is necessary to "equitably allocate the costs of public services in management of development on the urban fringe." (Dkt. 1-1, p. 60-61.) However, nothing in this phrase or in any other provision of I.C. §50-222 can be read to

empower a city to charge more than an amount necessary to equitably allocate the costs of public services.   *See, e.g., Arel v. T & L Enterprises*, Inc., 189 P.3d 1149, 1152 (Idaho 2008) (in determining legislative intent, the court first looks to the literal language of the statute and interprets statutes according to their plain, express meaning); *City of Grangeville v. Haskin*, 777 P.2d 1208, 1211 (Idaho 1989) ("If there is a fair, reasonable, substantial doubt as to the existence of a [municipal] power, the doubt must be resolved against the city.") (citation omitted).   Hailey cites no authority to support the proposition that the power to agree to a voluntary annexation implies the power to require a landowner to pay any fee a city can extract as a condition to the annexation, regardless of whether such fee is in any way tied to the costs of the annexation itself.   The absence of any authority for Hailey's position gives rise to a "fair, reasonable, substantial doubt" that this power can be implied from I.C. § 50-222.   *City of Grangeville*, 777 P.2d at 1211.

Contrary to Hailey's claims, there is no express nor implied grant of authority under Idaho Code § 50-222 that would authorize a city to charge any annexation fee it can extract from a developer.   If the Idaho state legislature intended such a result, it could have put express language in the statute authorizing cities to charge any negotiated fee.   *Alliance for Property Rights and Fiscal Responsibility v. City of Idaho Falls*, 742 F.3d 1100, 1107 (9th Cir. 2013).   The only reference that supports

an annexation fee in I.C. § 50-222 is instead the equitable allocation of costs language.   Hailey was authorized under I.C. § 50-222 to condition annexation of the Property upon payment by Old Cutters of its equitable share of the costs to be incurred by Hailey in annexing the Property to the extent such payment was essential to accomplishing the annexation.   However, fairly construed, there is nothing in this grant of power that authorized Hailey to condition annexation of the Property upon payment by Old Cutters of more than its equitable share of the costs to be incurred by Hailey in annexing the Property.

     *b.   Black v. Young*

     In *Black v. Young*, 834 P.2d 304 (Idaho 1992), the Idaho Supreme Court was asked to determine whether the city of Ketchum was authorized under Idaho Code § 50-311to impose contractual conditions not expressly provided for in the statute on property owners as a condition to granting the property owners' petition to vacate an alley.   The legislature enacted I.C. § 50-311 as the method for municipal corporations to follow when vacating an alley.   This statute empowers municipal corporations to "vacate [any alley] whenever deemed expedient for the public good . . . [provided that] the right of way, easements and franchise rights of any lot owner or public utility shall not be impaired thereby."   I.C. § 50-311.[15]   Importantly, the

---

15   The relevant text of I.C. §50-311 provides:

statute did not empower the city to impose any conditions upon the vacation of the alley except those relating to rights of way, easements, etc.

Plaintiffs in *Black* asked Ketchum to approve their application to vacate an alley, and offered to pay $5,000 and to transfer a log cabin and salvageable material from the property to be vacated to Ketchum in exchange. *Black*, 834 P.2d at 306. The Ketchum city council rejected plaintiffs' offer, and instead required that, in addition, plaintiffs obtain a building permit, obtain a commitment for a $2.5 million construction loan, and agree that the ordinance documenting the vacation agreement would grant Ketchum a right of reversion if a certificate of occupancy was not timely issued for the motel plaintiffs proposed to build. Plaintiffs accepted these terms and signed a written agreement incorporating them. Plaintiffs also signed an estoppel affidavit stating that the conditions imposed by Ketchum and the ordinance were acceptable, and which purportedly waived any right to thereafter challenge the agreement. *Id*. at 307. However, plaintiffs thereafter filed a complaint against the mayor and members of the Ketchum city council, maintaining the agreement they

---

Cities are empowered to: create, open, widen or extend any street, avenue, alley or lane, annul, vacate or discontinue the same whenever deemed expedient for the public good; to take private property for such purposes when deemed necessary…provided, however, that in all cases the city shall make adequate compensation therefor to the person or persons whose property shall be taken or injured thereby. The taking of property shall be as provided in title 7, chapter 7, Idaho Code. The amount of damages resulting from the vacation of any street, avenue, alley or lane shall be determined, under such terms and conditions as may be provided by the city council…

had signed was unenforceable because, in entering the contract, Ketchum had acted outside of the powers granted to the city by I.C. § 50-311. The district court held that since all of the target terms had been set forth in the contract, which clearly evidenced the intent of the parties, plaintiffs were bound by their agreement. *Id*. at 308.

On appeal, the Idaho Supreme Court reversed. In invalidating the ordinance and agreement, the court observed that "[t]he two conditions that the City of Ketchum imposed upon vacation of the alley, as well as the right of reversion should a certificate of occupancy not be issued, are not expressly granted powers, fairly implied powers from the clear language of Idaho Code § 50-311, nor are they powers essential to the vacation of the alley." *Id*. Instead, the only condition that Idaho Code § 50-311 allows upon a finding of expedience for the public good is that the vacation cannot impair "the right of way, easements and franchise rights of any lot owner or public utility." *Id.* (quoting I.C. § 50-311). Thus, the additional conditions Ketchum required plaintiffs to agree to amounted to *ultra vires* acts by the city, and were unenforceable.

The Bankruptcy Court determined *Black* was controlling, and concluded that, in requiring Old Cutters to pay a fee unquestionably in excess of that required to equitably allocate costs, Hailey engaged in an *ultra vires* act. As a result, the Court

held that despite Old Cutters' agreement, Hailey could not enforce that provision of the Annexation Agreement, and was not entitled to recover any additional fees from Old Cutters. (Dkt. 1-1, p. 58.)

On appeal, Hailey argues the Bankruptcy Court's reliance on *Black* was misplaced, and suggests the sole question at issue in *Black* was whether I.C. § 50-311 empowered Idaho municipal corporations to impose conditions on the vacation of alleys. (Dkt. 8, pp. 34-35.) Hailey suggests *Black* "[o]bviously…speaks to the meaning of I.C. 50-311 and says nothing whatever about the meaning of I.C. 50-222. The statutes are radically different in almost every relevant aspect." (*Id.*, p. 34.) The holding in *Black* is less limited than Hailey implies. *Black* did not simply provide that cities may not impose conditions on the vacation of alleys beyond those authorized under I.C. § 50-311, but instead more broadly explored the boundaries of a city's power when the legislature has enacted a statute to provide a city with the authority to act with regard to a specific topic. *Black* is applicable to this case because, just as Ketchum imposed conditions to vacation of the alley beyond those authorized for vacating alleys under I.C. § 50-311 in *Black*, Hailey here required conditions to annexation beyond those authorized under I.C. § 50-222. Under *Black*, an attempt by a municipal corporation to exercise powers that have not been expressly granted, granted by

implication, or which are not essential to the purpose of the statute, represents an *ultra vires* act. The Court affirms the Bankruptcy Court's holding that Hailey's imposition of an annexation fee unquestionably in excess of an equitable allocation of costs was not authorized under I.C. § 50-222, and was *ultra vires*.

The *Black* case is also relevant to another aspect of Hailey's appeal. Specifically, Hailey maintains in a Class A annexation, "an equitable allocation of costs of public services is whatever the parties agree to," and that the "voluntary execution of the annexation agreement by Old Cutters created a binding agreement that no court, including the Bankruptcy court, may void, alter or amend." (Dkt. 15, pp. 13, 15.) As mentioned, plaintiffs in *Black* had also agreed to the conditions to vacation of the alley imposed by the city, and had signed an estoppel affidavit which provided the conditions were acceptable to and would not be challenged by them. The Idaho Supreme Court significantly rejected Ketchum's attempt to use this contract as a basis for upholding the conditions Ketchum had imposed. As Justice Bistline explained in his concurring opinion:

> Nothing in I.C. § 50-311 states, suggests, or even intimates that a city is entitled to any *quid pro quo* for performing its statutory duty on being requested by a property owner to vacate an alley, or a street for that matter. The law is the same throughout the state of Idaho. A city is not allowed to profit from performing any of its statutory legislative functions. Nor should any city official do so. Nevertheless, it is abundantly evident here that some of the council members were openly negative towards granting the Blacks a vacation of the alley *unless the city obtained something in return*. The

Blacks full-well seeing how the wind blew, made the 'contributions.'

*Id*. at 314 (emphasis in original).

As the Bankruptcy Court explained, while "private parties enjoy near unfettered flexibility in negotiating contract terms, the Idaho Legislature and court decisions demand that cities have a statutory basis for their conduct in this context." (Dkt. 1-1, p. 61.)   Hailey's reliance on Old Cutters' agreement to pay the annexation fee is thus unpersuasive.   Even assuming the annexation fee was freely negotiated, and consent voluntary, this precise theory was advanced by Ketchum and expressly rejected by the Idaho Supreme Court in *Black*.   834 P.2d at 310. Moreover, the facts "here suggest that Old Cutters' consent to pay the annexation fee, fixed after years of study, posturing, and calculating by the city, may have been compelled by practical and financial necessities that arose during the nearly three-year process of annexation of the Property, and in light of the changing economy, Old Cutters need[ed] to get some lots sold."   (Dkt. 1-1, pp. 61-62.)   If, after three years of protracted negotiations and continuously rising fee proposals, Old Cutters had rejected Hailey's final annexation fee demand, it would have been forced to essentially start over and attempt to wade through the Blaine County subdivision application process.   Given Old Cutters' financial condition at the time and need to sell lots in order to pay its loan, starting over may not have been an

option. It is thus unclear whether Old Cutters' actually voluntarily consented, or was in fact financially compelled to consent, to the Annexation Agreement. Under these circumstances, the Court respectfully disagrees with Hailey's suggestion that the annexation fee was equitable simply because the parties agreed to it.

Finally, Hailey claims the Bankruptcy Court ignored an important element of the *Black* decision because in *Black*, plaintiff wanted the Court to declare the conditions imposed on the alley vacation invalid while keeping the vacation of the alley intact. (Dkt. 8, p. 35.) However, the *Black* court remanded to the trial court to determine if other factors regarding the "public good" requirement of I.C. § 50-311 supported vacation of the alley, factors independent from the conditions the court found Ketchum had illegally imposed. *Black*, 834 P.2d at 311. Hailey maintains the Bankruptcy Court erred in invalidating the annexation fee and community housing provisions without sending the annexation decision back to the city council, and suggests the Bankruptcy Court also erred by striking down conditions to the annexation while keeping the annexation itself intact. (Dkt. 8, pp. 35-36.)

In remanding to the trial court, the *Black* court noted "we are unable to discern, from this record, whether there was some independent basis for the public good requirement. For this reason, we reverse the judgment of the district court and

remand the case to the trial court to determine if other factors existed or were considered regarding the public good requirement of I.C. § 50-311." *Black*, 834 P.2d at 311. Unlike in *Black*, the record before the Bankruptcy Court established that Hailey made the findings necessary to determine that the annexation of the Property was in the interests of the city. As city council member Burke testified:

Q: My question was, what factors do you believe argued against not annexing the property?

A: Being able to reach a financial agreement.

Q: Is that it?

A: That's what I can answer right now, yes.

Q: So if you took the financial aspect out of it, you believed this was a good project to be developed in the City?

A: I did like the project, yes.

(Adversary Proceeding No. 11-8105, Burke Dep., Dkt. 50-2, 176:1-9.)

The factual findings made by Hailey in connection with issuing the ordinance to annex the Property also establish that Hailey believed the annexation was in the public's best interest because, among other reasons, it would protect the health, safety and welfare of the citizens of Hailey, represented an orderly extension of the city's boundaries, and was harmonious and in accordance with the specific goals and

policies of the applicable components of Hailey's comprehensive plan. (Adversary Proceeding No. 11-8105, Hailey Ordinance No. 939, Dkt. 50-4, pp. 66-80.) There is no reason to remand the annexation ordinance to the city council in light of the evidence establishing the Hailey city council has already determined annexing the Property met the requirements of I.C. §50-222(1).

Moreover, Hailey has already received $1.3 million in annexation fees from Old Cutters even though Hailey admits the costs of annexation were less than $788,000. Old Cutters thus does not seek to "have its cake and eat it too." (Dkt. 8, p. 35.) Old Cutters has more than paid for its equitable allocation of costs, and the Bankruptcy Court's decision invalidating fees above and beyond this allocation did not relieve Old Cutters from any enforceable obligations.[16]

c. *Idaho Code § 50-301*

Hailey also argues it had the authority to impose the annexation fee and community housing provisions under the express language of Idaho Code § 50-301. I.C. § 50-301 provides:

> Cities governed by this act shall be bodies corporate and politic; may sue and be sued; contract and be contracted with; accept grants-in-aid and gifts of property, both real and personal, in the name of the city; acquire, hold, lease, and convey property, real and personal; have a common seal, which they may change and alter at pleasure; may erect buildings or structures of any kind,

---

16   As the Bankruptcy Court noted, "Old Cutters has never suggested that it is entitled to a refund of any amounts previously paid to Hailey on account of the annexation fee, and to be clear, the Court does not conclude that a refund is required." (Dkt. 1-1, p. 66 n. 22.)

needful for the uses or purposes of the city; and exercise all powers and perform all functions of local self-government in city affairs as are not specifically prohibited by or in conflict with the general laws or the constitution of the state of Idaho.

I.C. § 50-301.

Although Hailey is empowered to contract and be contracted with under this provision, it may not enter into contracts that are "in conflict with the general laws or the constitution of the state of Idaho." *Id.* The Bankruptcy Court determined that imposition of a fee that exceeded Hailey's costs resulting from the annexation conflicted with the general laws of Idaho because, as in *Black*, the conditions were not authorized by the more specific, implementing legislation. (Dkt. 1-1, p. 65.)

Hailey claims this ruling was in error because the Annexation Statute, I.C. § 50-222, does not conflict with I.C. § 50-301. However, as the court held in *Black*, a city cannot contract for provisions it is not statutorily authorized to impose. As the Bankruptcy Court held, I.C. § 50-222 only authorizes annexation fees to the extent such fees are necessary to equitably allocate costs. Hailey cannot expand this limited authority through its general authority to contract. *Allied Bail Bonds, Inc. v. County of Kootenai*, 258 P.3d 340, 348 (Idaho 2011) (board of county commissioners could not expand its statutory authority by contractually creating duties it was not statutorily authorized to create). If I.C. § 50-301 permitted a city to contract for any conditions it wanted without specific authority for imposing such

conditions in another statute, a city's power would be endless.   And, again, given

the circumstances surrounding Old Cutters' eventual agreement to pay the

annexation fee, such agreement does not, as Hailey suggests, establish that the

annexation fee was equitable.[17]   (*See, e.g*., Dkt. 15, p. 13) ("In the final

analysis…an equitable allocation of costs of public services is whatever the parties

agree to.").   Because the authority to impose annexation fees in excess of an

equitable allocation of costs is not authorized under I.C. § 50-222, Hailey cannot

rely upon I.C. § 50-301 as authority for the imposition of such fees.

> ### d.  *Community Housing Provision*

The Court also affirms the Bankruptcy Court's holding with respect to the

community housing provisions in the Annexation Agreement.   Just as was the case

with the excessive annexation fee, I.C. § 50-222 contains no express provisions and

grants no implied authority to Hailey to require Old Cutters to construct a specific

number of community housing units in its development as a condition to annexation.

Nor is the community housing provision authorized under I.C. § 50-301.    Further,

Old Cutters' agreement with the community housing provision, like its agreement

with the annexation fee, does not alter the Court's conclusion that such provisions

---

17   The weakness in Hailey's claim that the annexation fee was equitable simply because Old Cutters agreed to it is further underscored by Hailey's failure to ever provide evidentiary support for the $3.8 million fee, and given its admission that Hailey's costs in annexing the Property were less than $788,000.

were *ultra vires* and unenforceable.    As the Court held in *Black*, a city is not allowed to expect or demand any *quid pro quo* conditions for performing its statutory duty, even if the conditions are put into a contract between the parties.

### e. *Buckskin Properties v. Valley County*

Hailey suggests the Idaho Supreme Court's recent decision in *Buckskin Properties, Inc. v. Valley County* ("*Buckskin*") 300 P.3d 18 (Idaho 2013) "should put to rest all of appellees claims regarding the annexation agreement in this litigation." (Dkt. 15, p. 14.)    In *Buckskin*, a land developer voluntarily entered into a capital contribution agreement with Valley County to pay certain fees to mitigate the impact of the development on certain county assets and services.   Specifically, Buckskin "agreed to participate in the cost of mitigating [impacts on public services and infrastructure reasonably attributable to the development] by contributing its proportionate fair share of the cost of the needed improvements identified in [the capital contribution agreement.]"   *Id.*, at 20-21.   The capital contribution agreement also required Buckskin to pay road improvement costs for future phases of the development and required the County to segregate Buckskin's contributions and apply them only to road improvement projects agreed upon by the parties.   *Id.*, at 21.

Although Buckskin paid the negotiated mitigation fee for several phases of the development project, no portion of the mitigation costs for phases 4-6 of the project was ever paid. Buckskin also ultimately filed a complaint against the County, seeking a declaratory ruling that the County's practice of requiring developers to enter into capital contribution agreements constituted an illegal impact fee and also seeking reimbursement of the money paid for phases 2 and 3 of the development.[18] The County moved for summary judgment on a number of grounds, including that Buckskin's lawsuit was barred by the four-year limitations period in I.C. § 5-224. The district court ultimately granted the County's motion but denied its requests for attorney fees. Buckskin appealed the district court's dismissal of its claims and the County cross-appealed the denial of its fee request.

On review, among other issues, the Idaho Supreme Court considered whether a governing board may lawfully make an agreement with a land developer for the funding and construction of new infrastructure. Much like Old Cutters, Buckskin contended it was required against its will to pay for road improvements in the vicinity of its proposed development as a condition of gaining the County's approval of its plans. Buckskin argued this was a condition unlawfully imposed upon it and

---

18 The term "Road Development Agreement" was used interchangeably with "capital contribution agreement" in the *Buckskin* opinion. *Id*., at 21, n. 1. For clarity, the Court here uses only the term "capital contribution agreement."

that the payment requirement constituted an unlawful development impact fee. *Id.*, at 22.

The Idaho Supreme Court determined that a developer and a governing board can legally enter into a voluntary agreement to fund capital improvements to be made by the governmental entity that facilitate the developer's development plans. *Id.*, at 25. The Bankruptcy Court in this case similarly found that Hailey and Old Cutters could agree to an annexation fee that represented an equitable allocation of costs, as Hailey was authorized to contract for such an amount under I.C. § 50-222. However, while the *Buckskin* court found the agreement between the developer and the County was enforceable, the Bankruptcy Court invalidated the Annexation Agreement to the extent the annexation fee exceeded Hailey's equitable allocation of costs. Several key distinctions in the facts illustrate how these holdings are concurrent.

First, in *Buckskin*, the contribution the parties agreed to was the amount specifically required to mitigate the impacts of the development on roads and bridges in the County. *Id.*, at 23. Pursuant to the County's capital improvement program, Buckskin was required to pay for the roadway capacity the development would use. *Id.* The Idaho Supreme Court held the County was entitled to contract for such an amount. Here the Bankruptcy Court similarly determined Hailey could

contract for an annexation fee that would compensate Hailey for the actual costs resulting from the annexation of the Property, as such fee may be required to equitably allocate the costs of annexation. However, the Bankruptcy Court held Hailey could not condition annexation of the Property upon payment by Old Cutters of significantly more than its equitable share of the costs to be incurred by Hailey in annexing the Property. (Dkt. 1-1, pp. 58-59.) The *Buckskin* court's finding that the County could contract for an amount required to mitigate the impact of the development on county roads and highways is thus consistent with the Bankruptcy Court's finding that Hailey could contract for an amount required to equitably allocate costs.

Second, the *Buckskin* court determined a developer and the county could voluntarily enter into an agreement to fund and construct capital improvements that would facilitate the developer's development plans. *Buckskin*, 300 P.3d at 23. Here, the initial and subsequent MP fee proposals also purported to include Old Cutters' proportional share of the cost of future capital assets that Hailey would like to build. (*See, supra*, text accompanying notes 3,4.) However, the record in *Buckskin* established that the County had made the improvements contemplated in the capital contribution agreement, that such improvements would not have been made but for the agreement, and that such improvements actually benefitted

Buckskin and the residents of the development.   Here, the record instead establishes

that many, if not all, of the capital improvements contemplated under the

Annexation Agreement have never been made, and, even if such improvements have

been made, Hailey made no effort to tie such improvements to Old Cutters' use of

them.   (*Id*.)   Indeed, even if Hailey had made the improvements, such

improvements would have otherwise been paid for through *ad valorem* property tax

paid for by all city residents, including Old Cutters residents.   (Dawson Dep.,

Adversary Proceeding 11-8105, Dkt. 50-2, 51:9-52:14.)   As such, Old Cutters (or

its residents) would be responsible for paying twice for the same capital

improvements—once through the annexation fee and again at the time such

improvements were constructed.   (*Id*.)   Given this, the fee imposed in this case is

significantly different from that at issue in *Buckskin*.   The Bankruptcy Court's

holding did not preclude Hailey from entering into an agreement requiring the

developer to shoulder a proportionate share of the costs of new public facilities.

Instead, the holding precluded Hailey from requiring the developer to shoulder

significantly more than its proportionate share of such costs, and from attempting to

impose a fee that was undisputedly unrelated to the impact the Old Cutters'

development had on Hailey.   This holding is consistent with the Idaho Supreme

Court's analysis in *Buckskin*.

A third and final important distinction between this case and *Buckskin* is that the *Buckskin* court specifically considered whether the payment agreement was truly voluntary, and determined there was no evidence to suggest Buckskin communicated any objection to the County about the terms of the capital contribution agreement. *Buckskin*, 300 P. 3d at 24. The court noted:

> There is no evidence in the record indicating that Buckskin was strong-armed into signing the [capital contribution agreement]; that it voiced any objection to anyone, at any time, to making the payment required…or that it did not, as the County avers, benefit from the agreement by virtue of the road improvements facilitated by its payments.

*Id*.

By contrast, as previously discussed, here there was evidence that Old Cutters felt forced to sign the Annexation Agreement given the lengthy delay of the annexation process and its need to sell lots, that Old Cutters repeatedly voiced its objections to Hailey regarding the continuously rising annexation fee,[19] and that Old Cutters did not, in fact, benefit from the agreement because the capital improvements that would allegedly be facilitated by the annexation fee were never made. Unlike in *Buckskin*, there was evidence here to suggest the payment agreement was not truly voluntary. Under these circumstances, the Bankruptcy Court's holding is not inconsistent with *Buckskin*.

---

19  *See, e.g., infra*, text accompanying note 20.

**4**.    **Estoppel**

Hailey argues the Bankruptcy Court should have found Old Cutters' claims were precluded from review under the doctrine of equitable estoppel under *Alexander v. Trustee of the Village of Middleton*, 452 P.2d 50 (Idaho 1969) ("*Alexander*") and by the doctrine of quasi-estoppel under *Terrazas v. Blaine County*, 207 P.3d 169, 176 n. 3 (2009) ("*Terrazas*").   Hailey suggests the Bankruptcy Court erroneously determined estoppel was inapplicable because it found the annexation fees and community housing obligations were *ultra vires* acts. Hailey also argues that even if the Bankruptcy Court's decision on the *ultra vires* was correct, quasi-estoppel would still apply.   (Dkt. 8, pp. 45-46.)

Hailey mischaracterizes the Bankruptcy Court's holding.   The Court did not determine equitable estoppel was inapplicable because the annexation fee and community housing requirements were *ultra vires*.   Instead, with respect to equitable estoppel, the Bankruptcy Court held Hailey had offered no undisputed facts to establish any of the elements of equitable estoppel, and that Hailey's reliance on *Alexander* was misplaced.   (Dkt. 1-1, pp. 45-48.)

The elements of equitable estoppel are:

> (1) a false representation or concealment of a material fact with actual or constructive knowledge of the truth; (2) that the party asserting estoppel did not know or could not discover the truth; (3) that the false representation or concealment was made with the intent that it be relied

upon; and (4) that the person to whom the representation was made, or from whom the facts were concealed, relied and acted upon the representation or concealment to his prejudice.

*Ogden v. Griffith*, 236 P.3d 1249, 1255 (Idaho 2010) (quoting *J.R. Simplot Co. v. Chemetics Int'l, Inc.*, 887 P.2d 1039, 1041 (Idaho 1994)).   As the Bankruptcy Court correctly found, Hailey did not offer, and has not offered on appeal, any facts to establish Old Cutters falsely represented or concealed any material fact.   Without this element, Hailey cannot establish any of the other requisite elements of equitable estoppel.

The Bankruptcy Court also appropriately determined the Idaho Supreme Court's decision in *Alexander* is distinguishable.   In *Alexander*, various landowners challenged, two years after the fact, an ordinance annexing their property to the city of Middleton.   452 P.2d at 51.   The *Alexander* court noted that although the city had failed to adhere to Idaho's annexation statute as it existed at that time, the city was nevertheless entitled to judgment on the basis of equitable estoppel.   *Id*. at 54. In so holding, the *Alexander* court explained that while other landowners whose property was proposed for annexation had protested and had their lands excluded from the annexation ordinance, plaintiffs had failed to ever contest the ordinance although they "had adequate notice of the intent to enact the ordinance and of the actual enactment of the ordinance" and although they "were aware that their land

would be included within the area to be annexed." *Id.* Unlike the landowners in *Alexander*, Old Cutters repeatedly questioned Hailey's authority to impose an annexation fee in excess of actual costs, and protested Hailey's attempt to do so.[20] Also unlike the landowners in *Alexander*, Old Cutters did not attempt to challenge the ordinance for the first time several years after it had passed, and without providing any indication prior to enactment that it disagreed with Hailey's approach.

More importantly, *Alexander* is also distinguishable because it involved a challenge to the validity of the ordinance annexing property, but did not contest the city's ability to require conditions, such as an annexation fee, as a prerequisite to annexation. As previously discussed, neither Old Cutters nor MWB challenged

---

[20] For example, in a January 6, 2006 letter to Hailey city attorney Ned Williams, counsel for Old Cutters re-stated Old Cutters' continuing opposition to the annexation fee, stating Old Cutters:

> [does] not believe it is appropriate to include the cost of future capital improvements in the annexation fee calculation. None of the improvements are required due to [Old Cutters] annexation request-they are apparently proposed for future construction whether or not this annexation is approved. Almost all of the money to fund these projects will come from bond issues, future taxes or grants. In each case, the Old Cutters property will be assessed its fair share of these costs together with other properties within the City if and when the projects get built. The Old Cutters property should not have to pay for the same thing twice.

(Adversary Proceeding No. 11-8105, Dkt. 50-8, p. 62; *see also Id.*, Dawson Dep., Dkt. 50-2: 82: 1-5 ("Q: What do you remember John Campbell saying about the annexation fee? A: In the early discussions I remember strong objections to the fees from John Campbell and from Jim Speck."); 82:21-24 ("Q: Do you remember anything else about anything John Campbell said about the annexation fee? A: I just remember him objecting to them quite stringently.")).

Hailey's decision to annex the Property, and the Bankruptcy Court did not review the annexation decision itself. Instead, the Bankruptcy Court considered whether Hailey had the authority to impose the provisions it required as a condition to annexation. *Alexander* is thus distinguishable and the Bankruptcy Court correctly concluded Hailey failed to establish the elements of equitable estoppel.

Hailey also challenges the Bankruptcy Court's finding with respect to quasi-estoppel. The doctrine of quasi-estoppel applies when:

> (1) the offending party took a different position than his or her original position, and (2) either (a) the offending party gained an advantage or caused a disadvantage to the other party; (b) the other party was induced to change positions; or (c) it would be unconscionable to permit the offending party to maintain an inconsistent position from one he or she has already derived a benefit or acquiesced in.

*Terrazas*, 207 P.3d at 176 (citing *Allen v. Reynolds*, 186 P.3d 663, 668 (Idaho 2008)). Hailey argues quasi-estoppel applies to the facts of this case because Old Cutters agreed to the annexation fee in the Annexation Agreement, which included a provision that the annexation fees were "fair and equitable to mitigate the impact on the City of annexation and development of the Property." (Dkt. 15, p. 18.) Hailey suggests Old Cutters obtained the advantage of annexation as a result of the aforementioned representation, that the Hailey city council would not have agreed to the annexation without Old Cutters' promise that it would pay the annexation fee, and that it would be unconscionable to now allow Old Cutters to enjoy the benefits

of the annexation without requiring payment of the unsettled portions of the annexation fee. (*Id*.; *see also* Dkt. 8, p. 46.)

As the Bankruptcy Court noted, Hailey has not established "that it would be unconscionable to allow Old Cutters to challenge the Annexation Agreement provisions if they violate Idaho state law or the United States Constitution." (Dkt. 1-1, p. 48.) Indeed, it cannot be considered unconscionable to allow a party to seek relief from a city that has exceeded its authorized powers. *Deer Creek Highway Dist. v. Doumecq Highway Dist*., 218 P. 371, 373 (Idaho 1923) ("An estoppel can never be invoked in aid of contract which is expressly prohibited by a constitutional or statutory provision.") Further, Hailey was aware that Old Cutters disagreed with Hailey's calculation of the annexation fee, and knowingly risked that Old Cutters may later challenge Hailey's methods in setting the fee. (Dkt. 1-1, p. 49.) And, Old Cutters has already paid substantially more than the $788,000 fee Hailey has confirmed exceeded the actual costs of annexation. Old Cutters is thus not attempting to enjoy the benefit of annexation without paying its equitable share of costs. "Quasi-estoppel is designed to prevent a party from reaping an unconscionable advantage, or from imposing an unconscionable disadvantage upon another, by changing positions." *Lunders v. Estate of Snyder*, 963 P.2d 372, 378 (Idaho 1998). Old Cutters has not gained an unconscionable advantage, as it has

already paid substantially more than its share of an equitable allocation of costs, and

Hailey has not been unconscionably disadvantaged, as it has received an amount

undisputedly greater than its costs of annexation.   Finally, as the Bankruptcy Court

noted, equity may only be invoked by a non-offending party.   *Precision Instrument*

*Mfg. Co. v. Auto. Maint. Mach. Co*., 324 U.S. 806, 815 (1945).   Because Hailey's

conduct in imposing the fee was illegal under Idaho law, equitable principals,

including quasi-estoppel, did not bar Old Cutters' claims.[21]

### 5.   Hailey's actual costs of annexation

Hailey claims the Bankruptcy Court erred when it determined that the

$1,317,000 already paid by Old Cutters exceeded the actual costs incurred by Hailey

in annexing the Property.   Hailey suggests the evidence relied upon by the

Bankruptcy Court did not support this finding.   The Bankruptcy Court's ruling on

this issue, a question of fact, is subject to the clearly erroneous standard of review.

*In re Antonie*, 447 B.R. 610, 612 (D. Idaho 2011).   Under this standard, if the

bankruptcy court's account of the evidence is plausible in light of the record viewed

in its entirety, this Court may not reverse the bankruptcy court's factual findings

even if it would have weighed the evidence differently.   *9E Am. Jur. 2d Bankruptcy*

§ 3797 (2d ed. 2014).   Further, the "clearly erroneous rule applies most strongly to

---

21  Hailey's argument that quasi-estoppel would still apply even if the Bankruptcy Court's
decision on *ultra vires* was correct, is thus inaccurate.   Hailey cannot invoke equity to
justify illegal conduct.   *Id.*

matters on which conflicting testimony has been presented, where the bankruptcy judge has been required to assess the credibility of the witnesses." *Id.*

This Court finds there was ample evidence in the record to support the Bankruptcy Court's holding that the $1,317,000 already paid by Old Cutters' exceeded Hailey's actual costs. In fact, Hailey admitted many times that its actual costs were less than the $788,000 initially recommended in the draft MP Report. For instance, during her deposition, Dawson offered the following testimony:

Q:    I'm just trying to understand, because if this [MP Report] is trying to assess what the actual costs are to the City, it seems to me that asking for a five-year, one-time payment of a portion of the service deficiency is going beyond what Cutters would actually cost the City in terms of provision of services. Would you agree with that?

A:    Once again, I don't think this study is about what Cutters would cost the City. I think this study is about what the fiscal responsible [sic] action of the City Council is. It's not about Cutters' costs. It's about—it's not about the cost of the development of Cutters. It's about the fiscal minimum that the City has to look at in order to accommodate that development in the future.

Q:    So you agree, then, that the [MP] study is going beyond what the actual cost to the City caused by Cutters?

A:     Yes.

(Adversary Proceeding No. 11-8105, Dawson Dep., Dkt. 50-2, p. 44:8-45:1.)

Q:     So then just going to the conclusion on page 22… in conclusion

Management Partners recommended that, 'Cutters make a one-time

contribution of $788,188 as the annexation fee.'   Right?

A:     Yes.

Q:     And again, this $788,000 goes beyond what the actual cost to the City

as a result of having Cutters annexed would be.   Right?

A:     Right.

(*Id.*, 53:23-54:6.)

Q:     You acknowledged that the report provides a recommended fee that is

far in excess of what the City's actual costs are as a result of annexing Cutters.

Right?

A:     Yes.   We talked about that.

(*Id.*, 71:8-12.)

Hailey argues in its Reply Brief that Dawson's testimony does not constitute

an admission, favorable or unfavorable, by the City of Hailey and claims "[n]o

statement attributable to Ms. Dawson has any significance whatever to this case."

(Dkt. 15, pp. 19-20.)   However, as Hailey city council members Keirn and Burke

both testified, Dawson was responsible for performing Hailey's annexation fee analysis. (Adversary Proceeding No. 11-8105, Keirn Dep., Dkt. 50-3, 76:17-77:25; Burke Dep., Dkt. 50-2, 127:25-129:24.) Keirn also confirmed that Dawson was the city council's source for information on city fiscal issues. (Keirn Dep., Dkt. 50-2, 12:16-23.) Burke similarly stated that she did not do any independent calculations of the cost of annexing Old Cutters to the city, and that she instead relied entirely on Dawson's recommendation with respect to calculating the appropriate annexation fee. (Burke Dep., Dkt. 50-2, 118:5-25.)

Moreover, the only evidence Hailey points to in support of its contention that the Bankruptcy Court erred in finding its costs were less than $788,000 is the testimony of Burke, who stated that, in her experience, residential developments do not pay for themselves, that the annexation fee represents an amount that will cause "no negative impact at the time of annexation, if that annexation goes forward," and that an annexation "must provide a positive benefit to the community," as annexing "with the hope of breaking even is too big a risk" for the city council to take.[22] (Dkt.

_____

22 Hailey also claims, for the first time in its Reply Brief, that the actual cost analysis never took into account the cost of providing irrigation water to the Old Cutters' project and that the Bankruptcy Court relieved Old Cutters of the cost of providing irrigation water to its own project. (Dkt. 15, pp. 20-21.) As Hailey failed to raise this issue in its opening brief, the Court need not address it here. *In re Rains*, 428 F.3d 893, 902 (9th Cir. 2005); *see also Coleman v. Quaker Oats Co*., 232 F.3d 1271, 1289 n. 4 (9th Cir. 2000) ("issues cannot be raised for the first time in a reply brief.") (citation omitted).

8, pp. 47-48.)   However, Hailey offers no evidence to suggest the $788,000 originally proposed by the MP study was less than an amount that would cause "no negative impact," nor that Hailey would simply break even if the fee were set at $788,000, nor any evidentiary justification for the $3.8 million fee Hailey ultimately imposed.[23]   Hailey had the opportunity to provide evidentiary support for the additional fees sought during the adversary proceeding.   Hailey failed to do so and, in light of Dawson's testimony that the city's costs of annexation were less than $788,000, this Court cannot find the Bankruptcy Court committed clear error when it determined the $1,317,000 already paid by Old Cutters exceeded Hailey's costs in annexing the Property.

Finally, Hailey claims that the Bankruptcy Court never pointed to the provisions in I.C. § 50-222 that contained an "actual direct, cost test," that the Court seemed to create the "actual, direct cost test out of whole cloth and then chide the city council for not using it in the negotiations with Old Cutters regarding the annexation agreement," and that the Court never set forth a formula for calculating "actual, direct costs."   (Dkt. 8, p. 47.)   However, the Bankruptcy Court did not establish a new formula or "actual, direct costs" test, but instead relied upon the draft MP report figure Hailey itself commissioned, and upon Hailey's testimony that the

---

[23] As the Bankruptcy Court noted, Burke and other members of the city council who approved the final annexation fee either professed ignorance or could not remember the basis for selecting the $3.8 million fee amount.   (Dkt. 1-1, p. 60 n. 19.)

amount calculated by the report, $788,000, far exceeded Hailey's costs of annexation.[24]   The Court also interpreted the language of I.C. § 50-222 to determine whether Hailey had statutory authority to condition annexation on payment of a fee significantly greater than that required to cover the costs of annexation.   Again, I.C. § 50-222 requires a city to "equitably allocate the costs of public services in management of development on the urban fringe."   In its appeal brief, Hailey provides no evidence whatsoever to establish the city ever attempted to tie the $3.8 million fee to an equitable allocation of Hailey's costs.

In sum, the Bankruptcy Court was careful not to establish a precise fee or set a maximum amount that would meet the aforementioned standard.   (*See, e.g.*, Adversary Proceeding No. 11-8105, Summary Judgment Hearing Transcript, Dkt. 110, 35:13-24.)   The Bankruptcy Court instead appropriately determined, in light of the undisputed evidence that Hailey's costs were less than $788,000, the fact that Old Cutters had already paid Hailey $1,317,000 in fees, and given Hailey's failure to provide evidentiary support for the more than $2 million in additional fees sought, that the $3.8 million annexation fee was unquestionably in excess of that required to equitably allocate costs, and, as such, was unenforceable.

---

24   In fact the draft MP report specifically included more than Hailey's actual costs, such as Old Cutters' share of capital improvement projects that have never been made.   *See, supra*, text accompanying notes 3 and 4.

**MEMORANDUM DECISION AND ORDER - 63**

### 6.  Idaho's statute of frauds

MWB appeals the Bankruptcy Court's holding that the property description in the Annexation Agreement was sufficient to satisfy Idaho's statute of frauds. Under the terms of the Annexation Agreement, Hailey's lien attached to the "Market Rate Lots," but not to the entire Property.   MWB suggests the Annexation Agreement did not effectively identify which specific proportions of the Property are subject to Hailey's claimed lien.   Thus, MWB argues that the provisions of the Annexation Agreement purporting to create "a lien on the Market Rate Lots" does not satisfy Idaho's statute of frauds because it does not sufficiently describe the property to which it was attached.

The Idaho statute of frauds renders an agreement for the sale of real property invalid unless the agreement or some note or memorandum thereof is in writing and subscribed by the party charged or by his lawful agent. I.C. §§ 9-503, 9-505(4). Agreements for the sale of real property that fail to comply with the statute of frauds are unenforceable both in an action at law for damages and in a suit in equity for specific performance.   *Hoffman v. S V Co., Inc.*, 628 P.2d 218, 221 (Idaho 1981) (citing 72 *Am.Jur.2d Statute of Frauds* § 285 (1974); 73 *Am.Jur.2d Statute of Frauds* § 513 (1974)).

To satisfy the statute of frauds, an agreement for the sale of real property must not only be in writing and subscribed by the party to be charged, but the writing must also contain a description of the property, either in terms or by reference, so that the property can be identified without resort to parol evidence. *Garner v. Bartschi*, 80 P.3d 1031, 1036 (Idaho 2003). However, a contract that references "'any record or external or extrinsic description from which a complete description could be had' sufficiently describes the real property for purposes of the statute of frauds." *Ray v. Frasure*, 200 P.3d 1174, 1178 (Idaho 2009) (quoting *Allen v. Kitchen*, 100 P. 1052, 1055 (Idaho 1909).

MWB and Hailey agree that, for a property description to be sufficient under the statute of frauds, the quantity, identity, or boundaries of the property must be determinable from the face of the contract or by reference to extrinsic evidence to which the contract specifically refers. (Dkt. 13, p. 30); (Dkt. 17, p. 6.) Notably, the Bankruptcy Court also applied this standard. (Dkt. 1-1, p. 24) ("'A description contained in a deed will be sufficient so long as [the] quantity, identity or boundaries of [the] property can be determined from the face of the instrument, or by reference to extrinsic evidence to which it refers.'" ) (quoting *Ray v. Frasure*, 200 P.3d 1174, 1178 (Idaho 2008)).

The Bankruptcy Court determined the term "Market Rate Lots" was sufficiently defined in the Annexation Agreement and in extrinsic evidence referenced in the Annexation Agreement so as to identify the quantity, identity or boundaries of the property. Specifically, the Annexation Agreement provided, "[t]he term 'Market Rate Lots' for the purposes of installment payments…shall mean only the one hundred eight (108) market rate single family and duplex lots. The four (4) townhouse lots, three (3) community housing development lots and Lot 73 are not included in this calculation." (Annexation Agreement, Dkt. 8-2, p. 24, ¶4.b.) The Court also relied upon Exhibit 1, which contained a metes and bounds description of the entire parcel comprising the Property, and Exhibit 2, a map showing the proposed lots within the Property in sequential order from Lot 1 to Lot 116, to find the quantity, identity or boundaries of "Market Rate Lots" could be adequately determined. (Dkt. 1-1, pp. 26-27.)

In so holding, the Bankruptcy Court relied upon *Gugino v. Kastera*, LLC (*In re Ricks*) ("*Ricks*"), 433 B.R. 806 (Bankr. D. Idaho 2010). MWB faults the Bankruptcy Court for relying on one of its own decisions as the basis of its ruling, and by not giving credence to Idaho Supreme Court decisions, such as *Ray v. Frasure* ("*Frasure*"), 200 P.3d 1174, 1178 (Idaho 2009). (Dkt. 13, pp. 34-36.) In *Frasure*, the Idaho Supreme Court determined reference to a physical address alone

was not a sufficient description of the property for purposes of the statute of frauds, as the physical address provided no indication of the quantity, identity, or boundaries of the real property.   200 P.3d at 1179.   In *Ricks*, the Bankruptcy Court concluded that a "hybrid" agreement calling not only for the purchase and sale of land, but which also included a commitment to provide the personal services needed to develop the property, satisfied the statute of frauds when it described the unplatted land to be transferred and developed as, "all the lots in the first phase of Spur Ranch...consisting of 14 lots south of Flint Drive and 30 lots north of Flint Drive." 433 B.R. at 814.   While this description had been challenged as violative of the statute of frauds, the *Ricks* court rejected the contention because, in the contract:

> [The parties] did not stop at inclusion of a physical address for the property, as did the parties in *Frasure*; rather they provided the existing legal description of the entire property, and identified a specific amount of completed lots that were to be developed and sold...indeed since the [] property had not yet been finally platted, they had no choice but to rely upon the legal description of the whole property supplemented by other informal identifying information.

*Id.* at 820-21.   The *Ricks* court concluded that the real estate agreement satisfied the statute of frauds and was enforceable, noting that "defects like those in the *Frasure* contract are not present in the [agreement]."   *Id.* at 821.

The Bankruptcy Court here determined that unlike a simple physical address, as that involved in *Frasure*, here the Annexation Agreement and its exhibits adequately described the location, quantity, and exterior boundaries of the Property. (Dkt. 1-1, p. 26.)   The Annexation Agreement defined "Market Rate Lots," as described above, and the Exhibits provided the metes and bounds description of the external boundaries of the properties and the 116 potential lots to be developed at a later date.   (*Id.*)   While Exhibits 1 and 2 identified the entire Property, and not just the "Market Rate Lots," this was the best property description available at the time. At the time the Annexation Agreement was executed, no final subdivision plat had been approved or recorded.   The Bankruptcy Court determined that, as in *Ricks*, "as nearly as they could do so at the time of executing the contract, and given the undeveloped state of the Property, the parties here identified the 'precise quantity of building lots and the exact outer boundaries of the project.'"   (*Id.*) (quoting *Ricks*, 433 B.R. at 820).   The Bankruptcy Court concluded, on this record, "the property description in the parties' agreement [was] sufficient to satisfy Idaho's statute of frauds and the requirements of *Frasure*."   (*Id.*, p. 27.)   Therefore, any lien created by the parties in Hailey's favor in the Annexation Agreement [was] not invalid for violation of the statute of fraud or mortgage statute."   *Id.*

The Court agrees with the Bankruptcy Court's holding.   As the Bankruptcy Court explained, *Ricks* and *Frasure* are consistent, and the Annexation Agreement, along with its exhibits, satisfied Idaho's statute of frauds by describing, as exactly as possible at the time, the "quantity, identity or boundaries" of the property to which the lien attached.   (Dkt. 1-1, p. 28.)   MWB claims the agreement at issue in *Ricks*, "a hybrid agreement" was a significant distinguishing factor, and that here the Annexation Agreement was not a hybrid.   However, as Hailey notes, this argument ignores that, at the time the Annexation Agreement was executed, no final subdivision plat had been approved or recorded.   Even so, Exhibit 2 depicted each of the lots to be developed, platted and built upon and showed their location within the development property.[25]   As was the case in *Ricks*, the Bankruptcy Court determined the parties identified the property as sufficiently as was possible given the early stages of the development.   Like the parties in *Ricks*, here Hailey and Old Cutters provided the existing legal description of the entire property, and identified a specific amount of completed lots that were to be secured by Hailey's lien within

---

25  Hailey attached an enlarged copy of Exhibit 2 to its Opposition to MWB's cross-appeal, and argued this more legible purported version of Exhibit 2 clearly identified the encumbered lots.   MWB vehemently protests Hailey's reliance on the enlarged map, as the enlarged map was not a part of the record below, was not authenticated, and may not even be valid.   The Court has not relied upon nor otherwise considered the enlarged map in reaching its conclusion with respect to the statute of frauds.

each portion of that parcel.[26]  *Ricks*, 433 B.R. at 820.

In conclusion, the Court finds the description of "Market Rate Lots" was sufficient in the Annexation Agreement and exhibits referenced in the agreement to satisfy the statute of frauds.   The Court accordingly affirms the Bankruptcy Court's finding that Hailey's lien on the Property is valid under the Idaho statutes.[27] However, because this Court also affirms the Bankruptcy Court's holding that Hailey does not hold an enforceable claim to collect any further amounts from Old Cutters under the Annexation Agreement, Hailey's lien is ultimately unenforceable.

---

26 Further, as Hailey suggests, the Annexation Agreement:

> did not contemplate or in any way involve the sale, conveyance or transfer of real property by Old Cutters to [Hailey] but did, however, address a myriad of issues including construction of infrastructure, location of streets, development of park land, construction of community housing, payment of annexation fees, etc.

(Dkt. 17, p. 20.)

Therefore, the Annexation Agreement was also, like the agreement at issue in *Ricks*, a sort of hybrid arrangement.

27 Given this finding, this Court, like the Bankruptcy Court, declines to address Hailey's estoppel argument with respect to MWB.

## ORDER

For the foregoing reasons, the Bankruptcy Court's December 31, 2012

opinion is **AFFIRMED** in its entirety.

DATED: March 31, 2014

Edward J. Lodge
United States District Judge